*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0275p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

ROBERT J. VAN HOOK,

*Petitioner-Appellant,*

No. 03-4207

*v.*

CARL S. ANDERSON, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 94-00269—George C. Smith, District Judge.

Argued: December 6, 2005

Decided and Filed: August 4, 2008

Before: MERRITT, MARTIN, and MOORE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** James D. Owen, Keith A. Yeazel, Columbus, Ohio, for Appellant. Stephen E. Maher, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Keith A. Yeazel, James D. Owen, Columbus, Ohio, for Appellant. Stephen E. Maher, Charles L. Wille, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee.

---

**OPINION**

---

MERRITT, Circuit Judge. This is an appeal in an Ohio death penalty case by the prisoner, Van Hook, seeking habeas corpus relief under 28 U.S.C. § 2254. On the evening of February 18, 1985, petitioner Robert Van Hook arrived at a bar frequented by male homosexuals in Cincinnati, Ohio. He left the bar with David Self, and the two proceeded to Self's apartment. Once there, Van Hook strangled Self to the point of unconsciousness. He then brutally killed Self, stabbing him several times in the head and abdomen. After stealing a few items from Self's apartment, Van Hook fled to Florida, where he was apprehended over a month later and subsequently confessed to the murder.[1]

---

[1]For a more detailed recitation of the facts surrounding the murder and Van Hook's apprehension, *see State v. Van Hook*, 1987 WL 11202 (Ohio Ct. App. May 13, 1987), and *Van Hook v. Anderson*, 444 F.3d 830 (6th Cir. 2006), *vacated en banc*, 488 F.3d 411 (2007).

Back in Ohio, Van Hook waived his rights to a trial by jury, and he pleaded not guilty and not guilty by reason of insanity. The three-judge panel, elected under Ohio law, rejected this defense and found him guilty of aggravated murder and aggravated robbery, which made him eligible for the death penalty under Ohio Rev. Code Ann. § 2929.04(A) (West 2008). Finding that the mitigating evidence did not outweigh the aggravators, the three-judge panel imposed the death penalty instead of life imprisonment.

Though he did not deny killing Self, Van Hook asserted unsuccessfully a variety of errors both on direct appeal and in state post-conviction proceedings. *See State v. Van Hook*, 530 N.E.2d 883 (Ohio 1988), *cert. denied*, 489 U.S. 1100 (1989). After exhausting all of his state court remedies, Van Hook sought a writ of habeas corpus in federal district court.

The district court denied the petition on all asserted claims of error. Our panel then reversed the judgment of the district court because under *Edwards v. Arizona*, 451 U.S. 477 (1981), Van Hook's confession to the Cincinnati Police should have been suppressed. We pretermitted all other remaining issues. *Van Hook v. Anderson*, 444 F.3d 830 (6th Cir. 2006), *vacated en banc*, 488 F.3d 411 (6th Cir. 2007) (by a vote of 8-7), *cert. denied*, 128 S. Ct. 614 (2007). After the Sixth Circuit, *en banc*, vacated our judgment and affirmed the district court's denial of the petition on the confession issue, the majority returned this case to our panel to analyze Van Hook's remaining grounds for habeas relief.

After a careful review of the record, we conclude that Van Hook's trial counsel was ineffective during the mitigation phase of the trial for three basic reasons, thereby violating his rights under the Sixth Amendment, as interpreted by the Supreme Court in three cases, *Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003) (incorporating the American Bar Association Guidelines For the Appointment and Performance of Counsel in Death Penalty Cases as the professional standard of performance), and *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (same). First, his counsel was deficient by failing to fully investigate and present as evidence all available mitigating factors; second, by failing to secure or attempt to secure an independent mental health expert to testify that the crime was the product of a mental disease; and third, by mistakenly introducing and also failing to object to proscribed evidence that was clearly damaging to Van Hook's case. The combined effect of these three errors prejudiced Van Hook, rendered the mitigating hearing unreliable, and led to the imposition of the death penalty. For these reasons, we reverse the decision of the district court with respect to ineffective assistance of counsel at the mitigation phase of the trial. We remand the case to the district court with instruction to issue a writ of habeas corpus vacating Van Hook's death sentence unless the State conducts a new penalty phase proceeding within 180 days of remand.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244, *et seq*., was signed into law and became effective on April 24, 1996. Because Van Hook filed his habeas corpus petition on October 10, 1995, the Act does not apply as a constraint on our interpretation and application of constitutional standards in this death penalty case. *See Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999). We review *de novo* the conclusions of the district court. *See Powell v. Collins*, 332 F.3d 376, 388 (6th Cir. 2003).

Since 1984, the standard for whether counsel's ineffectiveness fell below the minimum requirements of the Sixth Amendment contains two components: (1) the deficient performance of counsel and (2) the resulting prejudice of the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on an ineffective assistance of counsel claim, Van Hook must satisfy both the deficient performance and prejudice prongs of *Strickland*. *See Harris v. Bell*, 417 F.3d 631, 636 (6th Cir. 2005). For Van Hook to prove that his counsel's performance was constitutionally deficient, the performance must have fallen "below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. at 688, "under prevailing professional norms." While the Court

in *Strickland* did not lay out a detailed, bright-line set of rules for determining whether counsel's performance is adequate, as it did later in *Wiggins* and *Rompilla*, the Court did require that in normal cases such as this one counsel must investigate fully all aspects of a case, *id.* at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). It explained that this duty is of utmost importance in capital murder cases, especially at the mitigation phase where the lawyer's work may be the difference between life and death. *See id.* at 706 (Brennan, J., concurring in part and dissenting in part); *Harries v. Bell*, 417 F.3d 631, 637 (6th Cir. 2005) ("The prospect of being put to death unless counsel obtains and presents something in mitigation magnifies counsel's responsibility to investigate") (emphasis and internal quotations omitted). Thus, the typical focus of analysis in an ineffective assistance of counsel during mitigation case is "whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (emphasis in original).

After *Strickland*, this Court and the Supreme Court made clear in a number of cases that counsel in death cases should follow closely the ABA standards referred to above. *See Wiggins v. Smith*, 539 U.S. at 524, *Rompilla v. Beard*, 545 U.S. at 387 (2005) ("[W]e long have referred [to ABA standards] as guides to determine what is reasonable") (internal quotations omitted); *Haliym v. Mitchell*, 492 F.3d 680, 717-18 (6th Cir. 2007) (explaining that "the fact that counsel's performance fell short of several of the American Bar Association's guidelines" further reinforced the conclusion that counsel's performance was deficient). We have explained clearly that the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases [hereinafter ABA Guidelines] provide the "guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases." *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003), *see also Dickerson v. Bagley*, 453 F.3d 690, 693 (6th Cir. 2006) ("Our Court has made clear that . . . counsel for defendants in capital cases must fully comply with [the ABA Guidelines]."). All three of the deficiencies listed above, and explained more fully below, fall well below objective standards of reasonableness outlined in the ABA standards as applied in the case law developed in capital cases interpreting the Sixth Amendment requirement of the effective "assistance of counsel for his defense." U.S. Const. amend. VI.

## I. Failure to Investigate Mitigating Factors

Van Hook is correct that the performance of his trial counsel was deficient during the mitigation phase because his attorneys failed to fully investigate and present evidence of all the potential mitigating factors that could have reduced his sentence from death to life imprisonment. Counsel has a duty to investigate fully, unless counsel makes a reasonable strategic choice to limit the investigation. *See Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable judgments support the limitations on investigation.").

Our Court's precedents make clear that a partial but ultimately incomplete mitigation investigation is inadequate. *See Dickerson v. Bagley*, 453 F.3d 690, 695-97 (6th Cir. 2006) (holding that trial counsel was ineffective, despite having presented eight witnesses at mitigation, for failing to discover and introduce evidence that the defendant had a low I.Q., had a borderline personality disorder, was taunted at school, and was referred to as "the moron" by his mother); *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005) (holding trial counsel deficient at mitigation for failing to fully investigate the defendant's family history and mental health, despite having conducted at least six interviews). This is particularly true when counsel's investigation failed to reveal any of the significant, potentially mitigating details of the defendant's personal and family history. *See Haliym v. Mitchell*, 492 F.3d 680, 713 (6th Cir. 2007) (explaining that "the Sixth Circuit has frequently considered [the defendant's family history of abuse] an important mitigation factor"). Because the "history, character, and background of the offender" is expressly listed as a statutory mitigating

factor, Ohio Rev. Code Ann. § 2929.04(B), it is of utmost importance for counsel to investigate fully and present any of the aspects of the defendant's upbringing that might bear on his culpability. The ABA Guidelines explain that this investigation ought to include interviews with family members and all other people who knew the client: "It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others." ABA Guidelines ¶ 10.7, at 83. Such thorough interviews are necessary to reveal all potential arguments to support a case for mitigation.

Both this Court and the Supreme Court have also held counsel's performance deficient when counsel's last-minute investigation resulted in overlooking potentially powerful mitigating evidence. *See Williams v. Taylor*, 529 U.S. 362, 396-99 (2000) (explaining that counsel only began preparing for the mitigation proceeding "a week before the trial," thus not having enough time to uncover records of the defendant's "nightmarish childhood"); *Powell v. Collins*, 332 F.3d 376, 398 (6th Cir. 2003) (stating that the trial counsel spent only "two full business days" preparing for mitigation); *Glenn v. Tate*, 71 F.3d 1204, 1207 (holding that counsel's failure to make any significant preparations for the mitigation phase until after the conclusion of the guilt phase was itself "objectively unreasonable"). The requirement for counsel to perform thorough, not last-minute, investigations before a mitigation hearing is further reinforced by the ABA Guidelines: "The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase offenses, decisions about the need for expert evaluations, motions practice, and plea negotiations." ABA Guidelines ¶ 10.7 at 82 (internal parentheticals omitted). The ABA Guidelines also explain that preparing for the mitigation phase of trial "requires extensive and generally unparalleled investigation into personal and family history." *Id.* ¶ 10.7, at 81.

Applying these clear rules to the performance of Van Hook's trial counsel, it is clear that counsel's investigation into and presentation of mitigating evidence was deficient. While Van Hook's trial attorneys uncovered a little information about his traumatic childhood experience in their last-minute investigation, many of the most important details were not discovered and therefore were never presented to the sentencer. Significantly, trial counsel's investigation failed to reveal that Van Hook's parents repeatedly beat him (J.A. at 1619), that he had witnessed his father attempt to kill his mother several times (J.A. at 1619), and that his mother was committed to a psychiatric hospital when he was between four and five years old (J.A. at 1570). These details of his childhood are even more unsettling and potentially mitigating than the omitted family background evidence in *Dickerson*, where the omitted evidence simply included the fact that the defendant had been taunted at school and referred to as the "moron." The details about Van Hook's childhood, which were uncovered later by the more thorough investigation of Van Hook's habeas counsel, demonstrate that trial counsel's investigation into Van Hook's background was never finished because the investigation was conducted at the last minute.

Van Hook's counsel did not "begin quickly" before trial. Rather after the guilt phase, counsel started a last minute investigation for the mitigation hearing. (J.A. at 4400-04.) His attorneys thus spent far less time preparing than the counsel in *Williams*, where counsel was deemed ineffective for not having begun preparing for mitigation until a week before the guilt phase of trial. This cursory preparation for mitigation also parallels the preparations by counsel in *Glenn*, which this Court held to be objectively unreasonable.

By not performing the sort of extensive, thorough investigation that is a minimum requirement of trial counsel in these cases, the performance of Van Hook's counsel turned up very little of the available mitigation evidence. Contrary to the perception of the state appellate court, this omitted evidence was much more than "merely cumulative." *State v. Van Hook*, 1992 WL 308350, at *2 (Ohio Ct. App. Oct. 21, 1992). This omitted evidence goes far beyond the brief details of his parents' alcohol abuse and dysfunctional relationship that were presented at mitigation.

Nor can counsel's decision to terminate the mitigation investigation before uncovering this information be considered a reasonable, strategic decision. Considering the information that they had already learned about Van Hook's abusive family background, counsel certainly had reason to suspect that much worse details existed. But his attorneys decided not to interview or even contact Van Hook's step-sister, his paternal uncle, two of his paternal aunts, his maternal uncle, and the psychiatrist who treated his mother when she was committed. All of these individuals could have helped his counsel narrate the true story of Van Hook's childhood experiences in mitigation. All of them would have been willing to testify on his behalf. (J.A. 1569-73, 1619-26.)[2]

Failing to complete a mitigation investigation when additional family witnesses are available is not sound trial strategy; neither is waiting until four days before the mitigation hearing to begin the investigation. *See Williams v. Taylor*, 529 U.S. 362, 395 (2000); *Haliym v. Mitchell*, 492 F.3d 680, 712 (6th Cir. 2007); *Dickerson v. Bagley*, 453 F.3d 690, 695 (6th Cir. 2006); *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005). Because his trial lawyers failed to conduct a full mitigation investigation and present available mitigating evidence to the sentencer, their performance fell short of "prevailing professional norms," *Strickland*, 466 U.S. at 688.

## II. The Failure to Seek an Independent Mental Health Expert to Testify for the Defendant

Trial counsel's last minute mitigation investigation led to another violation of ABA Guidelines respecting the effective assistance of counsel: the failure to put on evidence that Van Hook's criminal behavior was the result of severe mental illness. Only in the post-conviction phase of the case did Van Hook's counsel seek or find an expert witness to testify that Van Hook's crime was the result of a mental disease. All three of the experts who testified at trial were appointed by the court, not selected by the defense, and testified in favor of the prosecution's argument that Van Hook did not suffer from a mental illness. The failure to seek or put on a mental health expert who would give evidence favorable to Van Hook was a serious error.

The ABA Guidelines state what effective death penalty counsel have known and practiced for years:

> In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider are the following: Expert . . . witnesses along with supporting documentation (*e.g.* school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability . . . [to] otherwise support a sentence less than death . . . and/or to rebut or explain evidence presented by the prosecutor.

ABA Guidelines ¶ 10.11, at 104. These standards for determining prevailing professional norms in death penalty cases highlight the way that an expert witness working closely with counsel can

---

[2]Counsel's decision not to introduce additional family background witnesses also cannot be justified under the strategy of attempting to prevent the sentencer from learning about prior criminal convictions. In several of our recent cases where few mitigation witnesses were introduced, we refused to find counsel's performance deficient in large part because these witnesses likely would have had to reveal the defendant's history of violence. *See Durr v. Mitchell*, 487 F.3d 423, 436 (6th Cir. 2007) (finding counsel not to be deficient when introducing family and friend witnesses might have caused prior rape convictions to come up in cross-examination); *Tinsley v. Million*, 399 F.3d 796, 809 (6th Cir. 2005) (finding counsel's decision not to introduce any mitigating character evidence reasonable because it might have revealed his prior manslaughter conviction); *cf. Hartman v. Bagley*, 492 F.3d 347, 360 (6th Cir. 2007) (finding counsel's decision not to introduce expert's report "strategic" because "it paint[ed] a decidedly unsympathetic portrait" of the defendant). To the contrary, the sentencer in Van Hook's case already knew of his prior convictions, and any additional witnesses that might have been called would have only further developed his case for mitigation.

strengthen the defense's case for mitigation. This court has long held that these standards "represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases." *Hamblin*, 354 F.3d 482, 487. They are "the clearest exposition of counsel's duties at the penalty phase of a capital case." *Id.* at 488.

The complexities of Van Hook's case demonstrate his particular need for an independent mental health expert to assist in the defense. He pleaded not guilty by reason of insanity (J.A. at 362), and his justification for this was that he had been diagnosed with a mental illness, *i.e.*, "borderline personality disorder." Furthermore, after Van Hook was found guilty, one of the few *statutory* mitigating factors relevant to his case was whether he "lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law" as a result of a "*mental disease or defect*." Ohio Rev. Code Ann. § 2929.04(B)(3) (emphasis added). Presenting a strong case that his psychiatric disorder constituted such a "mental disease or defect" required the aid of an independent psychiatric expert. Moreover, the other potentially mitigating factors to be weighed for his benefit were his "history, character, and background," as well as any other mitigating factors "relevant to the issue of whether [he] should be sentenced to death." *Id.* § 2929.04(B)(7). Van Hook had experienced a violent, traumatic childhood. Testimony by his father and mother during the mitigating hearing revealed that his father was abusive to his mother (J.A. at 4497), his parents had divorced when he was young (J.A. at 4500), and his father began taking him to bars at age eleven, where he was encouraged to consume alcohol and participate in fights (J.A. at 4467-69). An independent defense expert was therefore also crucial to explain to the sentencer how the details of his upbringing affected him psychologically, thereby reducing his overall culpability for the murder. An independent mental health expert was necessary to establish the strongest case of mental illness for the sentencer.

Despite the fact that Van Hook was entitled to an independent mental health expert and that such an expert would have bolstered his case, his trial counsel failed to exercise this right. Because the court had found Van Hook to be indigent (J.A. at 363), and because he pleaded not guilty by reason of insanity (J.A. at 362), Van Hook had triggered his right to an expert. *See Ake v. Oklahoma*, 470 U.S. 68, 85 (1985); *Powell v. Collins*, 332 F.3d 376, 392 (6th Cir. 2003). While the court did appoint three mental health experts to evaluate Van Hook, it is clear that none of these experts was the sort of independent expert needed by the defense. The circumstances surrounding the appointment of experts, as well as their evaluations as reported to the trial court, are summarized by the district court:

> Petitioner was indicted on April 18, 1985. Less than a week later, on April 23, 1985, petitioner's defense attorneys filed a plea of Not Guilty by Reason of Insanity ("NGRI"), which triggered three court-ordered psychiatric evaluations. The trial court appointed Dr. Emmet Cooper, Dr. Nancy Schmidtgoessling, and the Court Psychiatric Center to conduct evaluations of petitioner pursuant to the NGRI plea.

> Dr. Emmet Cooper, a psychiatrist, was called by defense counsel during petitioner's case in chief [and during the penalty phase of the trial]. He testified that petitioner suffered from a borderline personality disorder . . . . *But Dr. Cooper could not say that petitioner suffered from a mental disease or defect.*

> Dr. Nancy Schmidtgoessling, a clinical psychologist, testified for the prosecution during its rebuttal case and was also called by the defense during the penalty phase of the trial . . . . *She also testified, however, that petitioner never suffered from a mental disease or defect*, that he was aware of the quality and wrongfulness of his action, and that he was able to conform his conduct.

Dr. Teresito Alquizola, a physician and psychiatrist, testified for the prosecution during its rebuttal case. . . . *Dr. Alquizola testified that petitioner did not suffer from a mental disease or defect,* and that at the time of the offense, he possessed the capacity to know the wrongfulness of his actions and, to a large extent, was able to conform his conduct. . . .

In addition to the testimony given by Drs. Cooper, Schmidtgoessling, and Alquizola, a fourth report was prepared by Dr. Donna E. Winter of the Court Psychiatric Center in connection with the mitigation phase of petitioner's trial, pursuant to [Ohio Rev. Code Ann. § 2947.06]. Dr. Winter found that petitioner suffered form a borderline personality disorder. Dr. Winter went on to conclude that . . . . *petitioner was not suffering from a mental disease or defect*, that he was able to appreciate the criminality of his actions, and that he was capable of conforming his conduct.

(Emphasis added, J.A. at 5934-36.) It is evident from a review of the district court's summary that, of the four experts whose evaluations were considered as evidence, three were appointed by the trial court as an automatic response to Van Hook's insanity plea, and the fourth was retained by the prosecution. Van Hook's counsel did not seek an independent expert, as did the prosecution, but instead relied on the experts that had been triggered for Van Hook by his plea. This deficiency parallels the performance of counsel in *Haliym v. Mitchell*, 492 F.3d 680, 717 (6th Cir. 2007), where we recently held counsel's performance to be deficient for choosing to rely on the report of a court-appointed expert instead of utilizing available funds for an independent expert. It is also analogous to the performance of counsel in *Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir. 1995), where we faulted counsel for "settl[ing] for court-appointed experts whose reports were to be given to the jury . . . rather than exercising the [defendant's] right to obtain defense experts."

The record undermines the State's argument that Dr. Cooper (whom Van Hook called in the absence of his own expert during both the guilt and mitigation phases of trial) was a sufficient expert who was independent of the prosecution. Dr. Cooper testified during the mitigation hearing that Van Hook had "no remorse," that he was a "dangerous individual," and that he did not suffer from a "mental illness or defect." (J.A. at 4443.) Dr. Cooper was not an effective substitute for a real mental health expert selected by the defense.

The expert opinion of Dr. Martin Ryan, a psychiatrist retained by Van Hook's habeas counsel, demonstrates the magnitude of this failure. Dr. Ryan stated that it is more likely than not that a reasonable psychiatrist at the time would have concluded that Van Hook's severe borderline personality disorder was indeed a mental disease and met the test of "mental disease or defect" established by the Ohio statute quoted above. (J.A. at 5879.) His affidavit, which was submitted to the district court, explained that the disorder was considered a mental disease under the generally accepted standards approved by the American Psychiatric Association. (J.A. at 5879.) Respondent did nothing to rebut these statements by Dr. Ryan either in its brief or at oral argument.

### III.  Trial Counsel's Mistake Regarding the
### Pre-sentence Investigation Report

Trial counsel requested a Pre-sentence Investigation Report (the "Report") to be prepared, and that Report, including damaging victim-impact statements, was introduced into evidence during mitigation without any objection from counsel.  Courts in Ohio give a defendant in a capital murder trial the statutory option of having such a Report made before the mitigation hearing.  Ohio Rev. Code Ann. § 2929.03(D)(1).  If the defendant requests the Report, copies of the Report will automatically be furnished to the court, the prosecutor, and the defendant.  Counsel then loses control of how the Report is used at the mitigation trial.  Experienced capital counsel generally believe that it is a mistake to ask for such a Report.

This Court has explained before that requesting a Report instead of performing a full mitigation investigation is a sign of inadequate preparation.  *See Haliym v. Mitchell*, 492 F.3d 680, 717 n.29 (6th Cir. 2007) (stating that counsel's reliance on a PSI was part of the "overarching question of whether counsel's . . . preparation for mitigation was constitutionally deficient"); *Glenn v. Tate*, 71 F.3d 1204, 1209 (faulting counsel for requesting such a Report).  The ABA Guidelines similarly advise counsel for capital defendants in Ohio against requesting it.  *See Haliym*, 492 F.3d at 717 (citing ABA Guidelines at 1073) ("Because Ohio provides capital defendants the right to reasonably necessary investigation, experts, or other assistance for trial and penalty phases, capital counsel who request a pre-sentence report instead may be ineffective for doing so.").

Trial counsel then failed to object to the introduction of the victim-impact statement that was contained within the Report.  In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the introduction of victim-impact evidence at the mitigation phase of a capital murder trial violates the Eighth Amendment.  A few years later, though, the Court retreated somewhat by holding that "the Eighth Amendment erects no *per se* bar" on the introduction of all such evidence.  *Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (emphasis in original).  But the *Payne* Court said that it only overturned the part of *Booth* disallowing evidence "relating to . . . .the impact of the victim's death on the victim's family," and that it did not overrule the part of *Booth* that forbids "a victim family members' characterization and opinions about . . . the appropriate sentence."  *Id.* at 830 n.2.  Our Court recently aligned itself with many of our sister circuits in holding that victim-impact statements recommending an appropriate sentence are barred by the Eighth Amendment.  *See Fautenberry v. Mitchell*, 515 F.3d 614, 638 (6th Cir. 2008) (holding that "the trial court erred in admitting this evidence"); *see also Welch v. Sirnans*, 451 F.3d 675, 703 (10th Cir. 2006) (noting that many circuits have found this portion of *Booth's* holding "survived the holding in *Payne* and remains valid").  Thus, the introduction of any opinions of the victim's family that suggest an appropriate sentence for the defendants is precluded by the Constitution.

Van Hook's attorneys did not object when the Report they requested caused the entry of the victim-impact statements into evidence during the mitigation hearing.  (J.A. at 5561, 5567-68.)  The statements included a plea to the sentencer from Mrs. Self, the victim's mother, that Van Hook be given the death penalty.  Mrs. Self said that she "fe[lt Van Hook] should receive the maximum possible punishment."  (J.A. at 5568.)  She also stated that if the State did not execute Van Hook, "it just compounds the offense."  (J.A. at 5568.)  Finally, she said that "the maximum punishment would prevent another family from suffering as a result of [Van Hook's] actions."  (J.A. at 5568.)  The victim-impact statement included in the Report therefore contained an opinion by family members about what they thought to be the appropriate sentence.  Trial counsel invited a Report that contained a strong plea for the death penalty and did nothing to keep this recommendation out, even though the Eighth Amendment case law holds its admission unconstitutional.

Additionally, the ABA Guidelines emphasize the importance of counsel's objecting to potentially inadmissible evidence in a capital murder case.  *See* ABA Guidelines ¶ 10.7 at § 7 ("One

of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review."). Because Van Hook's counsel failed to object to the victim-impact evidence, and because his counsel in fact caused the victim-impact statement to go into evidence by requesting such a Report, his attorneys' performance fell below an "objective standard of reasonableness," *Strickland*, 466 U.S. at 688.

In sum, because Van Hook's trial attorneys failed to fully investigate and present his family background as mitigating evidence, failed to obtain the sort of independent mental health expert needed to prepare an effective defense, and failed to object to proscribed, damaging evidence, their performance was constitutionally deficient under the first prong of *Strickland*.

## IV. Prejudice

For an ineffective assistance of counsel claim to succeed, counsel must not only have performed deficiently, but that performance must have prejudiced the defendant. *See Strickland v. Washington*, 466 U.S. 668, 692 (1984). To prevail on the prejudice prong of a *Strickland* claim, Van Hook must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* Accordingly, because Van Hook challenges his death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. Van Hook must therefore show that his counsel's errors "were serious enough to deprive [him] of a proceeding the result of which was reliable." *Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir. 1995).

Counsel's deficient performance prevented the three-judge panel from learning fully about the two statutory mitigating factors that were the strongest in his case — his traumatic family background and his mental illness. The trial court concluded that there was "absolutely no evidence that would suggest that [he] suffered from a mental disease or defect." (J.A. at 629.) Had counsel sought out an independent mental health expert instead of using the experts automatically appointed by the court, that panel would have heard strong evidence that Van Hook's severe borderline personality disorder should indeed be considered a mental disease. While the court-appointed experts testified to the contrary, Van Hook's habeas expert, Dr. Ryan, testified at length that such a disorder was in fact considered a mental disease at the time of trial under the generally accepted standards approved by the American Psychiatric Association. (J.A. at 5879.)

Additionally, had his attorneys performed a complete mitigation investigation, that panel would have learned how Van Hook was often beaten by his parents, how he saw his father try to kill his mother, and how his mother was committed to a psychiatric hospital when he was a young child. (J.A. at 1570, 1619.) Further, had his attorneys sought out the available family members willing to help tell his story, that panel would have heard additional "first-hand accounts from those who knew [Van Hook] best," *Powell v. Collins*, 332 F.3d 376, 400 (6th Cir. 2003).

The deficient performance by Van Hook's counsel also caused the three-judge panel to consider unconstitutional and damaging information while deliberating on the appropriate sentence. It is generally true that, because judges in bench trials often hear inadmissible evidence, they are "presumed to ignore [it] when making decisions." *Harris v. Riviera*, 454 U.S. 339, 346 (1981); *see also Wickline v. Mitchell*, 319 F.3d 813, 823-24 (6th Cir. 2003) (holding that the three-judge panel would not likely have been misled by improper evidence). But here the panel expressly stated in its sentencing opinion that it had considered "the presentence report and mental examination report

requested by the defendant."**3** (J.A. at 623). When a panel of judges expressly states that it considered such inadmissible evidence, it is no longer proper to make such a presumption. For this reason, the present case is also distinguishable from *Fautenberry v. Mitchell*, 515 F.3d 614, 638-39 (6th Cir. 2008), where we held that the Ohio Supreme Court's refusal to reverse a sentence of death based on a similar victim-impact statement was appropriate. In that case, there was "no indication that the panel was influenced by or considered the victim-impact evidence available to them." *Id.* at 638. That cannot be said here.

The combined prejudice Van Hook suffered as a result of his counsel's failure to secure an independent mental health expert, failure to perform a complete mitigation investigation, and failure to object to inadmissible evidence prevented his mitigation hearing from being reliable. Our conclusion is bolstered by the fact that Ohio is a so-called "weighing" state, which means that the aggravating circumstances must outweigh the mitigating factors in order to impose the death penalty. Ohio Rev. Code Ann. § 2929.04(B). Van Hook's conviction only qualified for one of Ohio's statutory aggravating circumstances: his offense "was committed while [he] was committing . . . aggravated robbery." *Id.* § 2929.04(A)(7). Thus, the introduction of more available mitigating evidence could certainly have tipped the scales in favor of his life. The threshold for finding prejudice in this case is thus lower than in previous cases, where we found prejudice despite the trial courts' having found multiple aggravating circumstances. *Cf. Dickerson v. Bagley*, 453 F.3d 690, 691 (6th Cir. 2006) (finding prejudice on reweighing despite two aggravating factors); *Harries v. Bell*, 417 F.3d 631, 634 (6th Cir. 2005) (same); *Skaggs v. Parker*, 235 F.3d 261, 264 (6th Cir. 2000) (same).

Because of the combined effect of these errors, we believe that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. This is especially true because, as in *Dickerson*, "any one of the three judges alone could have prevented imposition of the death penalty." 453 F.3d at 699 (citing Ohio Rev. Code Ann. § 2929.03(D)(3), which requires unanimity for a death sentence). While it is possible that the panel "could have heard the evidence described above, and still have decided on the death penalty . . . that is not the appropriate test. Instead, we must ask whether 'the available mitigating evidence, taken as a whole, might well have influenced the [panel's] appraisal of [Van Hook's] culpability." *Harries v. Bell*, 417 F.3d 631, 640 (6th Cir. 2005) (citations omitted) (quoting *Wiggins v. Smith*, 539 U.S. 510, 538 (2003)). Considering the evidence that was available and yet omitted, together with the evidence that should not have been presented to the panel but was, we conclude that, absent Van Hook's counsel's deficiency, there is a reasonable probability that the result of his sentencing proceeding would have been different.

## V. Conclusion

Because we have decided that counsel offered constitutionally ineffective assistance to Van Hook at the sentencing phase of the trial, we will not decide, and we therefore pretermit the remaining issues. For the foregoing reasons, we reverse the decision of the district court and remand the case to the district court with instructions to issue a writ of habeas corpus vacating Van Hook's death sentence unless the State conducts a new penalty phase proceeding within 180 days of remand.

---

**3**The district court overlooked this important fact entirely in its determination that Van Hook's counsel's failure to object to the victim-impact evidence caused him no prejudice. That court stated in its analysis that "there is no indication whatsoever that the trial court gave weight to the victim impact evidence in determining that the aggravating circumstance outweighed the mitigating factors." (J.A. at 5910.) This statement is belied by the record.